# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KENDALE MCCOY, | |
| Plaintiff, | Case No. 12 CV 5467 |
| v. | Judge Jorge L. Alonso |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kendale McCoy brings this action against Defendants Wexford Health Sources, Inc., Kevin Halloran, Ronald Schaefer, La Tanya Williams, Arthur Funk and Marcus Hardy for deliberate indifference to his serious medical condition. Before the Court is Defendants Wexford Health Sources, Inc., Kevin Halloran, Ronald Schaefer, La Tanya Williams, and Arthur Funk's (collectively, the "Wexford Defendants") Motion for Summary Judgment [114] and Defendant Marcus Hardy's Motion for Summary Judgment [131]. For the following reasons, the motions are granted.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. Kendale McCoy, an inmate in the custody of the Illinois Department of Corrections, brings this action against the defendants on a single count of deliberate indifference to his H. Pylori bacterial infection and gastrointestinal illness since at least the fall of 2011. In 2011, McCoy was an inmate at Stateville Correctional Center. Complaining of abdominal pain, McCoy presented to Dr. Shaefer, an internal medicine staff physician for Wexford Health Sources, Inc. ("Wexford"), at Stateville, on October 14, 2011.

1

This was about two weeks after his symptoms began. Dr. Schaefer examined McCoy, and treatment notes indicate McCoy had blood in his stool. Dr. Schaefer ordered antacids and admitted McCoy to the infirmary for observation. McCoy also had received a prescription for Imodium and hemorrhoid cream earlier in October, before he was seen by Dr. Schaefer. McCoy was placed on a clear liquids diet, and Schaefer's plan was to work up McCoy for treatment of a possible ulcer. Schaefer ordered lab testing, an x-ray of McCoy's stomach, and a test for H. Pylori since H. Pylori bacteria is associated with approximately 70% of peptic ulcers, the suspected cause of McCoy's abdominal pain. McCoy was discharged from the infirmary four days later, with an order for Prilosec, and instructions to follow up in three weeks.

According to McCoy, however, he told infirmary nurses and Physician's Assistant La Tanya Williams that his condition had not improved while he was there, and that he continued to experience severe abdominal pain, bloody diarrhea, nausea, vomiting and restlessness. On October 16, 2011, Nurse H. Moss noted McCoy's statement that "Those pills aren't working and I have blood in my stool." [Dkt 142-4 at 2.] McCoy also says that he was denied the opportunity to speak with Dr. Schaefer about his complaints. Schaefer testified that he had no knowledge of any continued complaints, reports to nurses, or effort by McCoy to speak with him. Likewise, the October 18, 2011 discharge report notes no symptoms or complaints of pain, that McCoy had eaten a regular meal without incident, that returned labs were normal, and that there was no evidence of serious abdominal pathology. When McCoy's H. Pylori test returned positive a few days later, Schaefer ordered Prilosec, doxycycline, Flagyl and Pepto-Bismol for him. The doxycycline, a broad-based antibiotic, was to be taken for two weeks, and the Prilosec was to be taken for 30 days or more, depending on his symptoms.

In the weeks and months that followed, McCoy filed a series of grievances regarding his gastrointestinal symptoms and related medical care. Marcus Hardy was the Warden at Stateville when McCoy filed his first three grievances. Hardy did not review the grievances himself, however, because if a grievance is marked as an emergency, it is reviewed by a designee in Hardy's office, and if it is a non-emergency, it is directed to the grievance office.

In McCoy's first grievance, dated October 29, 2011 and marked emergency, McCoy reports vomiting, extreme abdominal pain, watery and bloody diarrhea, nausea and restlessness, and requests a visit with a specialist in gastro intestinal disorders. Warden Hardy's designee determined the grievance was not an emergency on November 4. Meanwhile, the grievance counselor responded on November 1 that the grievance had been forwarded to the Health Care Unit for review and response. McCoy's second grievance, dated November 22, 2011, again sought a referral to a specialist upon his complaint that his symptoms had not improved. It too was marked emergency but was determined by the warden's designee to be a nonemergency on December 12.

On November 22, 2011, McCoy also began writing letters regarding his complaints. He wrote to Warden Hardy that day, but as with the grievances, it is undisputed that Hardy never saw the letter addressed to him. [Dkt 145, Pl. Resp. Hardy SOF ¶ 5.] Instead, staff in his office are tasked with reviewing such material and sending it to the appropriate departments for response. About two weeks later, McCoy wrote to Dr. Arthur Funk, Wexford's regional medical director, and to Kevin Halloran, Wexford's chairman, but both letters were addressed incorrectly, and neither Funk nor Halloran ever received them. Similarly, McCoy's letters to Funk and Halloran the following month were also addressed incorrectly, and neither ever received them.

Meanwhile, on November 28, 2011, McCoy was seen by Williams, to whom he complained of continuing diarrhea with the presence of blood. Williams ordered that McCoy be given a complete blood count test and be retested for H. Pylori, and that he return for follow-up in a month. She also ordered Imodium to treat diarrhea.

About a week later, on December 6, 2011, McCoy filed his third grievance, which he labeled non-emergency. In it, he again requested to be sent to a specialist and reported continued severe stomach pains and watery and bloody diarrhea. The grievance was received by the counselor on December 9, and forwarded to the Health Care Unit for review and response on December 19, 2011.

Between January and April 2012, McCoy wrote a series of complaint letters to Williams, but she never saw them since different staff in the Health Care Unit are tasked with handling such communications. [*Id.* ¶¶21-22.] On May 5, 2012, McCoy filed a fourth grievance in which he complained that he had not yet received a response to his third one. On May 19, 2013, McCoy filed a fifth grievance, also complaining of bloody stool, diarrhea, and severe stomach pains and asking for an examination and treatment. He filed this action two months later, on July 11, 2012. [Dkt 1.]

On January 21, 2014, in response to a request by McCoy's counsel, Defendants were ordered to schedule "a comprehensive current medical examination and evaluation of [McCoy] addressing his long-standing condition, as soon as possible." [Dkt 153, Wexford Defs' Resp. Pl. Add'l SOF ¶ 23; *see also* dkt 77.] McCoy was then seen by another Wexford physician, Dr. Saleh Obaisi, on April 1, 2014. Based on McCoy's reported history, Obaisi suspected he had nonspecific inflammatory bowel disease, and prescribed the medication sulfasalazine. Thereafter, McCoy was referred to a gastroenterologist at UIC who in June 2014 diagnosed him with ulcerative proctitis.

McCoy filed his sixth grievance in August 2014 complaining that he had not yet had the six-month follow-up appointment that had been recommended by the gastroenterologist, despite being told he would have one in February 2015. On July 8, 2015, McCoy filed yet another grievance, in which he complained of the lack of prescribed medicine and placement on a no-soy diet as recommended by the UIC specialist.

In September 2015, McCoy had a routine physical with Williams, at which his health was considered to be "up to par." [Pl. Resp. Wexford SOF ¶ 66.]

## DISCUSSION

*Summary Judgment Standard*

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). The party seeking summary judgment has the initial burden of showing the lack of a genuine dispute and that it is entitled to judgment as a matter of law. *See Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). If the moving party demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. A "genuine" dispute is one that could change the outcome of the suit, and is supported by evidence sufficient to allow a reasonable jury to return a favorable verdict for the non-moving party. *Spivey v. Adaptive Mktg., LLC*, 622 F.3d 816, 822 (7th Cir. 2010).

Northern District of Illinois Local Rule 56.1 supplements Federal Rule of Civil Procedure 56. Its purpose "is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 397 (7th Cir. 2012). Pursuant to Local Rule 56.1, the moving party must provide a statement of material facts as to which the moving party contends there is no genuine issue, with specific references to supporting materials in the record. N.D. Ill. L.R. 56.1(a). The party opposing the motion is similarly required to file "a response to the moving party's statement, including in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(B)). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

The Court enforces Local Rule 56.1 strictly. *See FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). Similarly, the Court does not consider an asserted fact that is not supported by admissible evidence, or an asserted fact that is not supported by the cited evidence.

*Wexford Defendants' Motion for Summary Judgment*

According to the Wexford Defendants, summary judgment should be entered in their favor because McCoy fails each component of a deliberate indifference claim. Specifically, Defendants say there is no evidence from which to conclude that McCoy's condition was objectively sufficiently serious, that Schaefer or Williams acted with the requisite culpability to establish deliberate indifference, that Funk or Halloran had any involvement in McCoy's medical care, or that Funk or Halloran were even aware of it. McCoy argues in opposition that the record demonstrates the seriousness of his condition, ultimately diagnosed as ulcerative proctitis, and his consistent complaints of the same gastrointestinal symptoms. According to McCoy, the record further demonstrates each defendant's reckless disregard of his medical needs, as exemplified by the unreasonable delay in referring him to a specialist to properly treat his gastrointestinal complaints.

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate indifference claims contain both an objective and a subjective component: the inmate "must first establish that his medical condition is objectively, 'sufficiently serious,'; and second, that prison officials acted with a 'sufficiently culpable state of mind,' – i.e., that they both knew of and disregarded an excessive risk to inmate health." *Lewis v. McLean*, 864 F.3d 556, 562-53 (7th Cir. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations omitted)). An objectively serious medical condition is one that has been diagnosed by a doctor as needing treatment, or a condition so serious that even a lay person would easily recognize the need for medical attention. *See McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016).

7

Deliberate indifference rests on an intentional or essentially criminally reckless standard, rather than merely negligent conduct. *See McGee v. Adams*, 721 F.3d 474, 480-81 (7th Cir. 2013). A plaintiff must show that the prison official was on "sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 834). Prison officials may exhibit deliberate indifference to a known condition through inaction, *see Gayton v. McCoy*, 593 F.3d 610, 623-24 (7th Cir. 2010), or by delaying treatment and thus aggravating an injury or needlessly prolonging an inmate's pain*, see Lewis*, 864 F.3d at 563; *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012).

In arguing that McCoy's condition was not objectively serious, Defendants highlight the testimony of Drs. Shaefer and Funk that McCoy's 2014 diagnosis of ulcerative proctitis was unrelated to the symptoms with which he presented in 2011, and that if McCoy truly had the symptoms he says he endured for years, there would be objective evidence of the same in the record. Each of these arguments may be so, but they misperceive the lens with which the record is viewed on summary judgment.

Viewing the record in the light most favorable to McCoy, McCoy has presented enough evidence to support a finding that he suffered from an objectively serious medical condition. This is so regardless of whether McCoy's originally complained of symptoms were related to the ulcerative proctitis he was diagnosed with in 2014, although notably, McCoy fails to cite record evidence to support the asserted connection. [Pl's Resp. Wexford Defs' SOF ¶ 16.] Based on McCoy's initially complained of symptoms, Dr. Schaefer ordered that McCoy be admitted to the infirmary for observation and prescribed him medications. When his H. Pylori test returned positive, he was prescribed additional medication, and after his exam with Williams, he was prescribed more. The record includes McCoy's repeated complaints over time of the same

gastrointestinal problems including abdominal pain, diarrhea, and bloody stool, and the same requests for evaluation and treatment, from which a reasonable factfinder could find "the presence of a medical condition that significantly affect[ed McCoy's] daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008).

While the Wexford Defendants try to cast doubt on the veracity of McCoy's reported symptoms by pointing to Dr. Funk's testimony that certain of McCoy's medical records (i.e., his labs, and weights) are not consistent with his reports of years of diarrhea, pain and vomiting, the Seventh Circuit has made clear that at least as to the reported pain, "there is no requirement that a prisoner provide objective evidence of his pain and suffering – self-reporting is often the only indicator a doctor has of a patient's condition." *Greeno v. Daley*, 414 F. 3d 645, 655 (7th Cir. 2005). Defendants' argument notwithstanding, the records are not so opposed to McCoy's complaints that no reasonable factfinder could credit his alleged condition. Moreover, Defendants' argument fails to acknowledge that according to McCoy, he repeatedly tried to get further medical care which might have provided him additional objective evidence.

### *Dr. Schaefer and Physician's Assistant Williams*

As to Dr. Schaefer and Physician's Assistant Williams, Defendants argue no evidence suggests either one intentionally or recklessly disregarded McCoy's medical needs. To the contrary, they say, the record shows that during the short period of time Shaefer treated McCoy in October 2011, he ordered diagnostic testing, prescribed medication, and admitted him to the infirmary for observation. During the sole clinical interaction Williams had with McCoy for his gastrointestinal problems, on November 28, 2011, they continue, she examined him, ordered a complete blood count and a re-test for H. Pylori, prescribed Imodium, and ordered a one-month follow-up visit in a month. McCoy stresses in opposition that those actions were not enough to

treat his condition, and that "guided by Wexford policies and procedures," Schaefer and Williams "selected a single course of treatment that proved to be entirely ineffective over several years." [Dkt 142 at 11.] According to McCoy, Schaefer and Williams "turned a blind eye" to his condition, "despite his seven grievances and letters." [*Id.* at 10.]

Notably, a prison medical provider is not deliberately indifferent simply because she or he offers a different course of treatment than the one requested by the inmate. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Nevertheless, "[t]he receipt of some medical care does not automatically defeat a claim of deliberate inference," which still may be shown if a "prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal quotations and citations omitted). "To survive summary judgment," an inmate "need[s] to present evidence sufficient to show that [a medical professional's] decision was so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (internal quotation and citation omitted).

No evidence in the record here meets this exacting standard. The record does not suggest that Schaefer or Williams' decisions in treating him as they did, and without a specialist's input, represented a substantial departure from accepted medical judgment. It is undisputed that abdominal pain and symptoms like what McCoy complained of is one of the most common patient complaints, and would not involve immediately sending the patient to a specialist. [Pl's Resp. Wexford Defs' SOF ¶ 17.] Similarly, while McCoy says that his symptoms persisted after the medications prescribed by Shaefer and later Williams, no evidence suggests that this course of

treatment was based on anything other than the medical assessment of McCoy's condition. *See Whiting*, 839 F.3d at 663-64; *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (rejecting prisoner's argument that prison doctor's choice of pain medication demonstrated deliberate indifference because it differed from prisoner's own doctor's choice where no evidence suggested difference was departure from accepted professional standards or anything other than result of medical judgment). Inmates are not entitled to "unqualified access to healthcare," *Holloway*, 700 F.3d at 1073, the best care possible, or to demand specific care. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Neither medical malpractice, nor negligence rises to the requisite culpable state of mind for deliberate indifference, which is akin to criminal recklessness. *See, e.g., Cesal v. Moats*, 851 F.3d 714, 725 (7th Cir. 2017); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

Further, although McCoy asserts that he told Williams while he was in the infirmary that the medication initially prescribed had not helped him, the evidence to which he cites does not support the assertion. [Pl's Add'l SOF ¶ 7 and Exh D, Dkt 142, 142-4.] Rather, the cited medical record appears to be written by a nurse who is not a party to this action, and is dated two days after McCoy was admitted to the infirmary, and before the introduction of additional medication. [Dkt 142-4.] Notably, the discharge record notes the lack of serious abdominal pathology, and contains no evidence of complaints. Further, no evidence in the record suggests that either Schaefer or Williams were involved in the treatment of McCoy's complained-of condition after their October and November 2011 interactions.

Similarly, although McCoy points to several complaint letters he says he wrote Williams between January and April 2012, it is undisputed that she never saw or knew of them and that such inmate letters are processed by other staff members of the Health Care Unit. [Pl's Resp. Wexford

Defs' SOF ¶ 21.] It is in any event also undisputed that Williams had no role in scheduling follow-up appointments. [*See id.*] Nor do McCoy's grievances affect this analysis. It is undisputed that neither Schaefer nor Williams had any role in the review of McCoy's grievances or were otherwise made aware of them. [Pl.'s Resp. Wexford Defs' SOF ¶¶ 4, 24.] In sum, unlike McCoy's cited authorities, no record evidence suggests Schaefer or Williams knew of McCoy's complaints of persistent symptoms, such that it could be said they intentionally or recklessly disregarded his condition.

While McCoy clearly would have preferred to have been treated by a specialist in gastro-intestinal issues, it is well settled that a prisoner may not dictate his own course of treatment. *See Holloway*, 700 F.3d at 1074 (prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards"). "Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is blatantly inappropriate." *Pyles v. Fahim,* 771 F.3d 403, 411 (7th Cir. 2014) (internal quotations and citations omitted). At most, the evidence suggests McCoy's disagreement with the choice of treatment, not its constitutional inadequacy.

Nor does McCoy's argument that the decision not to send him to a specialist was one driven by cost or his vague reference to Wexford's policies save his claim. First, there is no evidence in the record to support McCoy's assertion. To the contrary, the evidence in the record suggests that Wexford does not incur costs as a result of a referral to UIC. Dr. Schaefer testified that Wexford is not limited in any way in referring inmates to outside specialists, and that no Wexford policy contains a limit to the number of referrals to specialists. While Plaintiff takes issue with this

testimony, he does not contradict it with any evidence in the record. [Pl's Resp. Wexford Defs' SOF ¶ 15.]

For these reasons, summary judgment for Schaefer and Williams is granted.

*Funk and Halloran*

According to the Wexford Defendants, summary judgment in Funk and Halloran's favor should be entered because there is no evidence that either received the letters McCoy sent them, or that either otherwise had knowledge of, or involvement in, McCoy's medical care. McCoy's only response to the motion is contained in a footnote in which he argues that even if they hadn't received the letters he wrote in 2011 and early 2012, Funk and Halloran were put on notice of McCoy's complaints when they were served with his First Amended Complaint.

This slim response fails to demonstrate a genuine issue of material fact. First, it is questionable whether McCoy's unsupported footnote suffices to avoid waiver of the claims outright; second, service of the complaint cannot suffice to show the requisite knowledge that is an element of the claim he brings. In any event, the claim fails on the merits. As to Dr. Funk, although his role as regional medical director involves administrative and clinical duties for Wexford, it is undisputed he was never involved in the provision of McCoy's medical care, and that he never met McCoy. [Pl's Resp. Wexford Defs' SOF ¶¶ 36, 67.] It is undisputed that McCoy's letters were addressed to an address that neither belonged to Funk or Wexford. [*Id.* ¶ 38, 39.] As to Halloran, as Wexford's Chairman he manages Wexford's business operations; he does not have any involvement in the provision of medical care to inmates. It is undisputed that he was never involved in the provision of McCoy's care, and that he has no knowledge of McCoy's condition or the treatment provided to him. [Pl's Resp. Wexford Defs' SOF ¶ 58.] Likewise, there is no dispute that McCoy's two letters to him were both addressed to an address that neither

13

belonged to Halloran or Wexford at the time that they were sent. [Pl's Resp. Wexford Defs' SOF ¶ 58.]

This is not to say that an inmate's letters may never serve as the basis to establish Section 1983 liability, but rather, the inmate must establish that "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Vance v. Peters*, 97 F. 3d 987, 993 (7th Cir. 1996) (internal quotations omitted). Here, there is no evidence the letters even reached the defendants, let alone evidence from which a factfinder could conclude that based on them, either Halloran or Funk "knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." *Vance*, 97 F.3d at 994. Accordingly, summary judgment is granted in their favor.

### *Wexford*

Defendants argue summary judgment should also be granted for Wexford because McCoy cannot show unconstitutional conduct by any individual defendant, and because even if he could, no evidence in the record suggests that any widespread unconstitutional practice or policy by Wexford caused the harm of which McCoy complains. Although McCoy refers generally in his opposition to Schaefer and Williams being "guided" by Wexford's policies and procedures, he does not elaborate on what that means, or otherwise respond on the merits to Defendants' argument. While McCoy initially complained that Defendants delayed in sending him to a specialist as a result of a policy or practice to avoid costs, the only specific policy or practice McCoy highlights in his opposition to the motion is the lack of a uniform medical record coding system, which he notably did not allege in his operative complaint. [*See* dkt 12, 142.] The Court agrees with Defendants that the claim against Wexford fails.

Even if McCoy had established a triable issue as to deliberate indifference on the part of any individual Wexford employee, to hold Wexford liable under Section 1983 and *Monell*, he would still have to show that his alleged injury was the result of Wexford's official policy or widespread practice. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 470-80 (1986); *see also Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978). Accordingly, in order to recover against Wexford, McCoy must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *See Shields v. Ill. Dept. of Corrs.*, 746 F.3d 782, 796 (7th Cir. 2014).

McCoy's earlier assertion that an effort to control costs was the driving force behind the complained of delayed referral to a specialist is undeveloped and unsupported. Without evidence that Wexford instituted a policy of minimizing costs over the wellbeing of patients, the theory is unconnected to the record. To the contrary, the only evidence on this point suggests Wexford has no limits on outside referrals. [Pl's Resp. Wexford Defs' SOF ¶ 15.]

Likewise, even considering McCoy's belated focus on Wexford's recordkeeping system, the Court agrees with Defendants that McCoy fails to offer evidence connecting the lack of a uniform coding system to the alleged failure to provide him medical care. [*See* dkt 12, 142.] His only effort to connect the records to his claimed injury is to argue that "no red flag" was sent up in response to his persistent complaints. But even this argument is unsupported by any evidence in the record. A prisoner's "belief that he received sub-par medical care does not automatically support a *Monell* policy or custom claim." *Barrow v. Wexford Health Sources, Inc.*, No. 14 CV 800, 2017 WL 784562 (S.D. Ill. March 1, 2017) (internal quotations omitted).

Accordingly, summary judgment in Wexford's favor is granted.

*Hardy's Motion for Summary Judgment*

Finally, former Stateville Warden Marcus Harvey also seeks summary judgment on the grounds that McCoy cannot show that his condition was objectively, sufficiently serious, that Hardy was aware of McCoy's condition, or that he acted with deliberate indifference to McCoy's serious medical need. [*See* dkt 131.] While McCoy does not dispute that Hardy had no knowledge of McCoy's condition or his grievances, he nevertheless argues a triable issue exists based on Hardy's "systematic delegation of grievance review amounting to his approval and facilitation of this faulty process causing him to effectively turn a blind eye to the true issues being raised by McCoy." [Dkt 144]

Here too McCoy's claim fails for lack of any evidence of the requisite culpable intent. It is not only undisputed that Hardy never saw McCoy's grievances or letter, but also that those communications were reviewed and responded to by other officials within the prison. [Pl's Resp. Hardy's SOF ¶¶ 3-5.] McCoy's attempt to evade the import of these facts by challenging the system by which Hardy delegated the task of grievance review, runs counter to the law of this Circuit.

As discussed above, "a supervising prison official cannot incur § 1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right." *Vance*, 97 F.3d at 993; *accord Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Section 1983 does not establish a system of vicarious responsibility.") "Liability depends on each defendant's knowledge and actions, not on the knowledge and actions of persons they supervise." *Burks*, 555 F.3d at 594. Moreover, it is well settled that:

> Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages

16

> under § 1983 for not being ombudsmen. [Plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor . . . and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care. That is equally true for an inmate complaint examiner.

*Burks*, 555 F.3d at 595 (internal citations omitted). McCoy's attempt to hold Hardy liable for his delegation of complaint review, especially without any dispute suggesting the grievances were not timely addressed and referred to medical professionals is "just an effort to evade by indirection, Monell's rule that public employees are responsible for their own misdeeds but not for anyone else's." *Id.* at 596. McCoy's disagreement with the care provided does not suffice to save his claim. Without evidence demonstrating a genuine issue that Hardy condoned an unconstitutional practice by other prison employees, Hardy's motion for summary judgment is granted.

## CONCLUSION

For the reasons discussed above, Defendants Wexford Health Sources, Inc., Kevin Halloran, Ronald Schaefer, La Tanya Williams, and Arthur Funk's Motion for Summary Judgment [114] is granted, and Defendant Marcus Hardy's Motion for Summary Judgment [131] is granted. Civil case terminated.

Date: 9/24/18

Jorge L. Alonso
United States District Judge

17